**Iraj DANAIPOUR, Petitioner,**

v.

**Kristina Thermaenius MCLAREY, Respondent.**

**No. CIV.A.01–11528–MLW.**

United States District Court, D. Massachusetts.

Jan. 2, 2002.

Nancy Baskin, Boston, MA, Mary Alys Azzarito, Salem, MA, Stephen J. Cullen, Miles & Stockbridge, P.C., Towson, MD, for Iraj Danaipour, Plaintiff.

Beth I.Z. Boland, Elizabeth B. Burnett, Meredith Brand Wade, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Kristina Thermaenius McLarey, Defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. SUMMARY

This is a sad and serious case. It arises because two parents each love their children, but no longer love each other and have divorced. Petitioner Iraj Danaipour and his former wife, respondent Kristina McLarey, have been granted joint custody by the courts of Sweden of their daughters, A.D., who is seven years-old, and C.D., who is three years-old.[1] In June

---

1. With the agreement of the parties the court is using the children's initials rather than their full names to protect their privacy.

2001, McLarey violated Swedish court orders by bringing A.D. and C.D. to the United States, where they are residing with McLarey and her fiancé David Morin, and refusing to return them.

Danaipour has petitioned for the return of his children to Sweden pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11, 670, 19 I.L.M. 1501 (Oct. 24, 1980) (the "Hague Convention" or the "Convention"). It is undisputed that in June 2001 Sweden was the habitual residence of the children and that Danaipour was exercising his legal right to joint custody when his daughters were wrongfully removed to the United States. In these circumstances, the Hague Convention ordinarily requires the children's return. The Convention, however, provides certain exceptions to this general rule.

McLarey alleges primarily that Danaipour sexually abused A.D. and C.D., and that their return to Sweden, under any conditions, would expose them to "a grave risk" of "psychological harm." The court is not required to order the return of the children if McLarey bears her burden of proving such a risk by clear and convincing evidence.

In assessing any potential risk to the children, the court is required to consider the conditions on which they would be returned to Sweden. Danaipour denies that he sexually abused his daughters. Danaipour has, however, now agreed to the entry of orders in the United States and Sweden which, among other things, would provide that: the children may return and live with McLarey in Sweden; he will have no contact with them unless authorized by the Swedish courts; in Sweden he will fully participate in a forensic evaluation to determine if any sexual abuse has occurred; and he will obey any resulting court orders in the future, as he has in the past.

This court conducted a bench trial on December 19, 20 and 21, 2001. McLarey, Danaipour, experts for each party, a therapist who has been treating A.D. and C.D. since September 2001, and other witnesses testified. The court's factual findings, which are influenced significantly by its assessment of the credibility of the witnesses, include the following.

The evidence does not indicate that Danaipour sexually abused A.D. in any way. McLarey has proven by a preponderance of the evidence that there is good reason to be concerned that Danaipour may have masturbated in the presence of C.D. once or twice and may have caused her to touch his penis on one of those occasions. Such conduct would constitute a form of sexual abuse.

A forensic sexual abuse evaluation, conducted by a competent professional pursuant to protocols requiring the participation of both parents and the children, is necessary to determine reliably whether any sexual abuse has occurred. It would take months to conduct such an evaluation properly. A forensic evaluation could be conducted in Sweden.

Neither A.D. nor C.D. suffered from Post–Traumatic Stress Disorder ("PTSD") at the time that they were abducted from Sweden. McLarey has not proven by a preponderance of the evidence that either child suffers from PTSD now. Nor has McLarey proven by clear and convincing evidence that the children's return to Sweden on the conditions being ordered in Section V of this Memorandum will create the grave risk of psychological harm to them that would permit the court to deny Danaipour's petition.

Accordingly, Danaipour's petition is being allowed. McLarey is, therefore, being ordered to take the children back to Sweden, where they will reside with her, in order to permit a forensic sexual abuse evaluation to be conducted and to permit the courts of Sweden to decide the implications of that evaluation for the future custody of A.D. and C.D. The return of the children on the conditions being ordered by the court will preserve the health and safety of the children while providing the courts of Sweden the opportunity to determine the custody of children who were in Sweden and subject to their jurisdiction prior to being abducted. This decision will, therefore, serve the primary purposes of the Hague Convention.

## II. *THE APPLICABLE STANDARDS*

The Hague Convention, to which the United States and Sweden are each signatories, seeks to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, preamble; *see also Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir.1999). In the instant case, it is undisputed that the retention of A.D. and C.D. in the United States is "wrongful" within the meaning of the Convention.

"The wrongful taking of a child from his or her country of habitual residence normally requires the child's return." *Walsh v. Walsh*, 221 F.3d 204, 216 (1st Cir.2000). A respondent may, however, defeat a petition by proving that an exception established by the Convention applies. Hague Convention, Arts. 12, 13(a), 13(b), 20.

McLarey initially invoked three exceptions in this case. She alleged that the return of the children to Sweden should be denied because: "there is a grave risk that [their] return would expose them to physi-cal or psychological harm or otherwise place [them] in an intolerable situation," *see* Hague Convention, Art. 13(b); such a return would be contrary to "the fundamental principles of [the United States] relating to the protection of human rights and fundamental freedoms," *see* Hague Convention, Art. 20; and each child "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views," *see* Hague Convention, Art. 13, penultimate paragraph.

The exceptions to the general rule requiring return are narrow. *See Walsh*, 221 F.3d at 217. The Explanatory Report to the Convention states that the exceptions:

> are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter. In fact, the Convention as a whole rests upon the unanimous rejection of this phenomenon of illegal child removals and upon the conviction that the best way to combat them at an international level is to refuse to grant them legal recognition ... [A] systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration.

Elisa Pérez–Vera, Explanatory Report: *The Hague Conference on Private International Law*, in 3 Acts and Documents of the Fourteenth Session 426, ¶ 34 (1980) (the "Explanatory Report"); *see also Walsh*, 221 F.3d at 217.

Consistent with this, United States law imposes on a respondent the burden of proving the exceptions established by Articles 13(b) and 20 by clear and convincing evidence. *See* 42 U.S.C. § 11603(e)(2)(A). The third exception invoked in this case,

the exception based on the child's objection, need only be proved by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(B).

"Clear and convincing evidence" is evidence that produces "a firm belief or conviction as to the matter at issue." *Fifth Circuit Pattern Jury Instructions, Civil,* § 2.14 (1999). It is such proof that "leaves no substantial doubt ... It is proof that establishes ... not only that the proposition at issue is probable, but also that it is highly probable." Sand et al., *Modern Federal Jury Instructions,* 73–3 (2001).

■ However, while the Article 13(b) and 20 exceptions must be proven by clear and convincing evidence, subsidiary facts relevant to those exceptions need only be proven by a preponderance of the evidence. *See Application of Walsh,* 31 F.Supp.2d 200, 204 n. 3 (D.Mass.1998), *rev'd on other grounds Walsh v. Walsh,* 221 F.3d 204 (1st Cir.2000); *Care and Protection of Laura,* 414 Mass. 788, 794, 610 N.E.2d 934 (1993); *S.S. v. D.M.,* 597 A.2d 870, 882 n. 32 (1991). As the District of Columbia Court of Appeals has written, "there may be twenty facts, each proved by a preponderance of the evidence, that in the aggregate create clear and convincing evidence ...." *S.S.,* 597 A.2d at 882 n. 32.

The heart of McLarey's argument is that returning the children to Sweden, even on the conditions agreed to by Danaipour, would expose them to a grave risk of psychological harm. In *Walsh,* the Court of Appeals for the First Circuit thoroughly and thoughtfully explored the meaning of the Article 13(b) exception McLarey invokes. 221 F.3d at 218–19. In deciding issues presented by Article 13(b) "[c]ourts are not to engage in a custody determination." *Id.* at 218. Nor is Article 13(b) to be used to litigate the child's best interests. *Id.* at 219.

For the purposes of Article 13(b), the proven psychological harm "must be a great deal more than minimal." *Id.* at 218. It is doubtful, however, that it must amount to an intolerable situation. *Id.* at 218 n. 12. In any event, the risk must be "grave." *Id.* at 218. "[W]hen determining whether a grave risk exists, courts must be attentive to the purposes of the convention." *Id.* A grave risk may not "be established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal." *Id.* at 220 n. 14; *see also Blondin v. Dubois,* 238 F.3d 153, 164–65 (2d Cir.2001).

Moreover:

A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings. Necessarily, the "grave risk" exception considers, *inter alia,* where and how a child is to be returned. The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction. Given the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows for the achievement of the goals set out in the Convention while, at the same time, protecting the children from exposure to grave risk of harm.

*Walsh,* 221 F.3d at 219 (citations omitted); *see also Blondin,* 238 F.3d at 163 n. 11. Nevertheless, "there may be times when there is no way to return a child, even with

undertakings, without exposing him or her to grave risk." *Walsh*, 221 F.3d at 219.

*Blondin* was a case in which the district court relied on Article 13(b) in refusing to order that two children be returned to France because it found that persistent abuse had caused them to suffer "an acute, severe traumatic disorder" while living in France and their repatriation under any conditions would almost certainly trigger a recurrence of the traumatic stress disorder they had experienced in France. 78 F.Supp.2d 283, 291 (S.D.N.Y.2000). "[I]n the particular and unusual circumstances presented," the Court of Appeals for the Second Circuit affirmed the judgment of the District Court. *Blondin*, 238 F.3d at 168.

At trial, McLarey attempted primarily to prove that the instant case is analogous to *Blondin*. As discussed in Section IV below, however, the court finds that this case is distinguishable from *Blondin* in material respects and that neither Article 13(b) nor any other exception to the Hague Convention has been proven. Therefore, the court is ordering that A.D. and C.D. be returned on certain conditions.

## III. *THE FACTS*

Unless otherwise indicated, the following facts are proven by a preponderance of the credible evidence.[2]

McLarey was born in Sweden and grew up in the United States, where she attended college. She is both an American and a Swedish citizen. Danaipour was born in Iran and is now a citizen of Sweden, where he is a practicing child psychologist.

The couple's first daughter A.D. was born in Sweden in 1994, about six months before McLarey and Danaipour were mar-

ried in Massachusetts. In 1998, their daughter C.D. was born.

By the summer of 1999, the parties' marriage was troubled. McLarey returned to the United States to visit her family and reconnected with a former boyfriend, David Morin. McLarey and Morin became romantically involved. In late 1999, while McLarey was again in the United States, Danaipour found some love letters Morin had sent her. When McLarey returned to Sweden, Danaipour revealed his discovery and the parties decided to divorce.

Danaipour did not abuse McLarey physically or psychologically during the course of their marriage. Nor is it proven that Danaipour abused either of his children before he and McLarey filed for divorce on February 29, 2000.

When they filed for divorce, McLarey and Danaipour were temporarily given joint custody of their children. Initially, Danaipour and McLarey continued to live together in their small condominium during the pendency of their divorce proceedings. This was a tense situation. In the Spring of 2000, piqued by jealousy, Danaipour cut the modem cord on McLarey's computer because he thought she was violating their agreement that she would not send e-mail to Morin when Danaipour was at home. On another occasion Danaipour pushed McLarey. However, as her counsel acknowledged in closing argument, McLarey does not claim that she would be in danger of physical or psychological harm if required to return to Sweden with her children.

As her counsel also stated at closing argument, McLarey does not now contend that there is a grave risk of physical harm

---

**2.** In assessing credibility the court has, among other things, relied on its observations

of the witnesses.

to her children if they return to Sweden with her on the conditions discussed below.[3] Dec. 21, 2001 Tr. at 228. Rather, McLarey asserts primarily that each of the children will be exposed to a grave risk of psychological harm if required to return to Sweden on any conditions.

In about June 2000, tensions in the apartment caused McLarey to consider moving with her children to a women's shelter. Instead, she brought A.D. and C.D. to the United States for what she told Danaipour would be a short vacation and did not return to Sweden. When he learned that his children had been abducted, Danaipour obtained Swedish court Orders giving him sole custody of A.D. and C.D., and requiring that McLarey return the children to Sweden.

In about September 2000, McLarey returned to Sweden. The children lived with Danaipour for two or three weeks, occasionally visiting their mother in the women's shelter in which she resided temporarily. In this period, McLarey regained joint custody of A.D. and C.D., in part by representing to the court that she would not take the children out of Sweden again and by surrendering the children's passports. *See* Ex. 40. Danaipour was ordered to allow McLarey to live in the condominium and to find new housing for himself. The girls then began residing with each parent on alternating weeks.

McLarey testified that she noticed that A.D. and C.D. returned from their week-long visits to their father with redness in their vaginal areas. The children had experienced, and been treated for, such irritation before. McLarey, however, was concerned that Danaipour was doing something improper to cause the redness she perceived. She asked A.D. and C.D. about this. A.D. made no statements that suggested that Danaipour had abused her. C.D., who was then two-years old, said something to her mother about Danaipour "hammering" a "pee pee" and illustrated this with a gesture that resembled male masturbation. McLarey interpreted this as C.D. saying that Danaipour had done something to her vagina.

The evidence in this case, however, does not prove that Danaipour did anything that would have injured or irritated A.D. or C.D.'s vagina.[4] A forensic evaluation, conducted by a competent professional pursuant to established protocols, would be necessary to determine in a medically reliable manner whether either child was sexually abused in any way. No such evaluation has been done.

McLarey acted on her concern that her children had been sexually abused. She

---

3. Independent of these concessions, the court finds that McLarey has not proven that she or her children would be exposed to a grave risk of physical harm if returned to Sweden on the conditions being ordered in Section V of this Memorandum. Nor would McLarey be exposed to a serious risk of psychological harm. The issue of possible psychological harm to the children is discussed in detail later in this Memorandum.

4. In reaching this conclusion, the court relies on the following evidence, among other things. Only McLarey testified to seeing the redness. Although McLarey promptly consulted a nurse and child psychologist in Swe-

den, neither saw the children or the alleged redness. As discussed, *infra*, physical exams of A.D. and C.D. in Sweden and the United States disclosed no evidence of sexual abuse. A.D. has made no statements to her mother, her therapist, or anyone else that suggest that her father sexually abused her in any way. C.D.'s statements to her therapist, which are described *infra*, indicate that C.D. may have observed her father masturbate once or twice, and may have touched his penis on one such occasion. C.D. did not, however, tell her therapist that Danaipour had done anything that would have irritated or injured her vagina.

reported her observations and C.D.'s statements to a nurse, but did not bring the children to be examined by the nurse while they were allegedly experiencing the redness McLarey described. The nurse referred McLarey to a child psychologist, who also never saw A.D. or C.D.

Based on McLarey's complaints, the child psychologist prompted the initiation of an investigation, by a Swedish social service agency, of possible sexual abuse. *See* Ex. 44. The investigation began in late November 2000 and included interviews with C.D., her parents, her grandmother Myra McLarey, her day-care providers, and information obtained from others. In connection with that investigation, the Swedish police met with C.D. at a police station, but obtained no evidence of sexual abuse, largely because C.D. was uncooperative. On January 11, 2001, C.D. was examined at a hospital by a doctor and others associated with Sweden's National Board of Forensic Medicine. *See* Exs. 6 and 44. The examination of her genitals and anus disclosed no evidence of sexual abuse. *Id.*

On February 21, 2001, the social service agency issued its report. Ex. 44. The agency concluded that: "There is nothing in the information provided to us that indicates that [C.D.] has been exposed to sexual transgression." Ex. 44, at 7. The investigators also stated that: "From our conversations with different persons during the period of the investigation we find it likely that [C.D.] has been affected by her parents' conflict. We understand, however, that if the parents take responsibility for cooperating in a satisfactory manner for [C.D.] and her sister, [C.D.] has all opportunities to continue to develop in a positive way." *Id.* Accordingly, the social service agency terminated its investigation.

At this time, McLarey and her children were living with Morin, who had moved to Sweden. McLarey was not satisfied with the results of the social service agency's investigation. Therefore, in March 2001, she requested that the Swedish courts investigate whether A.D. and C.D. had been abused and that Danaipour be ordered to participate in a forensic evaluation to determine whether sexual abuse had occurred. Danaipour denied abusing either of his children and declined to agree to a forensic evaluation. *See* Exs. 22 and 41. The court caused further investigation to be conducted, in part to determine whether to order Danaipour to participate in such an evaluation. *Id.* That investigation included, among other things, interviews with A.D. and C.D., their parents, and their teachers. Ex. 41. A.D.'s teachers described her as a "happy and positive" person. Ex. 41, at 7. C.D.'s preschool teachers reportedly stated that:

[C.D.] is seldom ill and ... [is] happy and playful. She learns easily, is open and easily establishes contact with adults and children .... After [C.D.'s] absence during the summer [when McLarey improperly kept her in the United States], they had a new familiarisation period of a week. [C.D.] did not have any difficulties in coming back, she soon re-established herself.

*Id.*

In their assessment, the court's examiners relied in part on the teachers' comments and stated that:

On the basis of contacts with [A.D.] and [C.D.] by the teachers, the day-care centre staff, previous social welfare officers involved and ourselves, we think they both receive and have received very good care from their parents. At our home visits we have seen how both par-

ents have a fine, close and natural contact with their daughters.

*Id.* at 8. The examiners also stated that:

> During the investigation period nothing has been established, either in the police investigation or in the [social service agency investigation] or during our investigation, that suggests that either of the girls has been subject to sexual abuse.

*Id.* at 9.

After reviewing the evidence, including the foregoing report, the Swedish court found "no reason" to order a forensic sexual abuse evaluation "against the will" of Danaipour. Ex. 22. Thus, McLarey's request was denied. *Id.*

McLarey, however, continued to believe deeply that her children had been sexually abused and that a proper evaluation to determine whether this had occurred was vital. She evidently had a right to appeal the Swedish court's decision denying her request for a forensic evaluation. *See* Ex. 22. As indicated earlier, McLarey had also represented to the Swedish court that she would "not unlawfully take her children to the United States or detain them there again," Ex. 40, at 2, and had surrendered her children's passports in connection with this promise. Nevertheless, she obtained new passports for them and, with Morin, brought A.D. and C.D. to Massachusetts in late June 2001.

A.D. and C.D. were with Danaipour prior to their departure. Danaipour credibly describes them as playing very happily with him and their friends before they left Sweden. He understood that they were going to the United States for a short visit with their grandparents.

However, on July 3, 2001, McLarey and her mother, Myra, as the purported representative of A.D. and C.D., filed an action in this court seeking both a declaratory judgment that the children were not wrongfully removed from Sweden within the meaning of the Hague Convention and an injunction prohibiting Danaipour from having contact with them. *See McLarey v. Danaipour,* C.A. No. 01–11164–MLW (Complaint). An attorney, purportedly acting on behalf of A.D. and C.D., referred them to the Massachusetts Society for the Prevention of Cruelty to Children (the "MSPCC") for sexual abuse examinations. Ex. 12. The MSPCC found its evaluation of each child for sexual abuse to be "inconclusive." *Id.* The examiner stated, however, that with regard to A.D. and C.D., "there is clear evidence of trauma due to exposure to domestic violence." *Id.* This finding is utterly unsupported by the evidence in this case.

The MSPCC referred A.D. and C.D. to the Children's Hospital in Boston to be examined for possible sexual abuse. The results of the tests conducted there for each child revealed no physical evidence of abuse and were deemed "normal."

McLarey's attorneys then asked that Danaipour agree to a forensic sexual abuse evaluation in the United States. He did not agree. Rather, he demanded that his children be returned to Sweden. He also initiated this case, pursuant to the Hague Convention, in the Middlesex Superior Court of the Commonwealth of Massachusetts. That court issued, *ex parte,* several Orders favorable to Danaipour. On September 5, 2001, this case was removed to this United States District Court.

By agreement of the parties, the Orders issued by the state court were vacated and Danaipour was authorized to speak to his children by telephone, three times a week. This court subsequently appointed Elaine Epstein, Esq. Guardian Ad Litem (or Next Friend) and attorney for A.D. and C.D., pursuant to Federal Rule of Civil Proce-

dure 17(c).[5] By agreement of the parties, the case filed by McLarey was dismissed without prejudice.

The Hague Convention requires that courts act "expeditiously in proceedings for the return of children." Hague Convention, Art. 11. If requested, a court must explain why a case has not been decided within six weeks of its initiation. *Id.* This court has provided such an explanation to the Central Authority of Sweden.

Because of the complexity created by the allegation of sexual abuse, in October 2001 the parties agreed, and the court ordered, that discovery could be conducted until December 17, 2001. In her November 21, 2001 Preliminary Report, the Guardian Ad Litem recommended that this case be tried in 2001. She stated, among other things, that it would be in A.D.'s best interest to know where she will be in school when a new semester begins in January 2002. *See* November 21, 2001 Preliminary Report of Guardian Ad Litem/Attorney for the Children, at 4. The Guardian Ad Litem also stated that the five months that the children have been in the United States is "inordinately long," because they have not seen their father in that period and the mere passage of time causes them to become more "settled" in the United States, although this alone would not be a sufficient reason for denying their return if it is otherwise warranted. *Id.* Therefore, with the agreement of the parties, this case was tried from December 19 through December 21, 2001.

On December 3, 2001, after the Guardian Ad Litem had recommended that it would be in the best interests of the children to complete the trial in December 2001, McLarey filed a motion requesting that the court order Danaipour to participate in a forensic sexual abuse evaluation in the United States. On December 7, 2001, Danaipour filed an opposition to that motion. After a hearing on December 7, 2001, the court denied McLarey's motion without prejudice, in part because the proposed evaluation could not have been conducted prior to the then-scheduled December 19, 2001 trial. The court indicated that if the evidence at trial persuaded it that a forensic sexual abuse evaluation in the United States was necessary and appropriate before a decision whether to grant Danaipour's petition could properly be made, the trial could be suspended. For the reasons described below, the court concludes that it is neither necessary nor appropriate that such an evaluation be conducted in the United States, rather than in Sweden.

Prior to trial Danaipour proposed, and agreed to obey, certain conditions if this court orders that A.D. and C.D. be returned to Sweden. More specifically, Danaipour has agreed that A.D. and C.D. may return with their mother and reside exclusively with her. He has also agreed to have no access to the children in Sweden, pending a full forensic sexual abuse and physical abuse evaluation of himself, McLarey, A.D. and C.D. This condition goes beyond the recommendation of the Guardian Ad Litem, who suggests that while a forensic evaluation is being conducted C.D. continue regular telephone contact with her father and A.D. have the weekly supervised visits with him that are now authorized by Swedish court Orders. *See* Dec. 17, 2001 Final Report of Guardian Ad Litem/Attorney for the Children, at 8–13.

Danaipour has always obeyed the orders of the Swedish court and of this court. He

**5.** Ms. Epstein has, without compensation, provided invaluable assistance to the parties and the court in this matter. Her *pro bono* efforts extend the highest tradition of the legal profession. Her contribution to the administration of justice is much appreciated.

has agreed that the Swedish court may use the results of the forensic evaluation in deciding whether to alter its prior Orders granting McLarey and him joint custody of their children. Danaipour and McLarey have agreed to request that the Swedish court enter a "mirror order" imposing any conditions ordered by this court. This court concludes that a Swedish court would do so. Danaipour and McLarey have also represented that they would obey the orders of the courts of Sweden. This court finds that Danaipour, at least, would do so.

The primary factual issues to be resolved by the testimony at trial relate to whether Danaipour sexually abused either A.D. or C.D., whether either or both of them now suffers from PTSD and, in any event, the degree, if any, that either or both of them are likely to suffer psychologically if returned to Sweden on certain conditions. As indicated earlier and discussed below, the court finds that A.D. has not been sexually abused in any way; C.D. may have been exposed to her father masturbating; neither A.D. nor C.D. suffered from PTSD in Sweden or suffers it now; and neither would suffer from PTSD or any other unusual psychological harm if she returned with her mother to Sweden.

There is no credible evidence that A.D. has been sexually abused by her father in any way. She has not made any statements suggesting that this occurred to her therapist or her mother. Several physical exams provided no evidence of sexual abuse. No expert has opined that A.D. has been sexually abused.

The credible evidence does not prove that C.D. has been sexually abused physically. In September 2001, A.D. and C.D. began seeing Dr. Toni Luxemburg, a therapist found by a lawyer and hired by McLarey. As Dr. Luxemburg repeatedly emphasized, she has been treating the children and considers herself their "advocate." Dec. 20, 2001 Tr., at 148, 153. She acknowledges that she has not attempted to conduct a neutral evaluation, pursuant to proper protocols, to determine if A.D. or C.D. were sexually abused by their father. *Id.* at 148.

C.D. has, however, made statements to Dr. Luxemburg that indicate that Danaipour may have masturbated once or twice in front of C.D. and may have caused her to participate on one occasion. More specifically, C.D. told Luxemburg that "Baba," as she calls her father, "squeezed his hole," which Dr. Luxemburg reasonably interpreted to be his penis, and it was very hard. *Id.* at 23. C.D. also stated that Baba had "hammered" his "pee pee," meaning his penis, and C.D. illustrated this statement with a gesture resembling male masturbation. *Id.* at 29, 35. C.D. also stated that she had "hammered" her father's "pee pee." *Id.* at 35. C.D. indicated that probably on another occasion, Baba "hammered" himself, C.D. did not help, and Baba was mad. *Id.* Dr. Luxemburg believes that C.D. was "communicating to [her] that she had witnessed her father touching his genitals and that he had her touch his genitals." *Id.* at 60.

On cross-examination, Dr. Luxemburg clarified that she was not saying that there was some type of masturbation in front of C.D. *Id.* at 128. In any event, C.D. made no statements to Dr. Luxemburg indicating that her father had touched her vagina. Dr. Luxemburg does, however, believe that C.D. reliably reported to her a form of sexual abuse.

The statements that C.D. made to Dr. Luxemburg are consistent with certain statements C.D. made to her mother

and, arguably, to Morin's sister.[6] The court finds Dr. Luxemburg credible in her report of C.D.'s statements. Those statements provide good reason to be concerned that Danaipour may have masturbated in front of C.D. and, on one occasion, engaged her in that conduct. If that occurred it was, as another of McLarey's experts, Dr. Carole Jenny, opined, a form of sexual abuse. However, the credible evidence persuades the court that a forensic evaluation is necessary to determine with a reasonable degree of reliability whether any form of sexual abuse has occurred and, if so, who the abuser was.

Dr. Luxemburg opined that both A.D. and C.D. now suffer from PTSD. Another of McLarey's expert's, Dr. Luxemburg's mentor Dr. Bessel van der Kolk, agreed that C.D. suffered from PTSD, but did not find that the data justified such a diagnosis for A.D. In Dr. van der Kolk's view, it would be extremely traumatic for C.D. to be returned to Sweden on any conditions because she was sexually abused there and to her Sweden is synonymous with her abuser—her father. Dr. Jenny agrees. However, Dr. Carlton Munson, Danaipour's expert, testified that neither A.D. nor C.D. could be properly deemed to suffer from PTSD and that both could be returned to Sweden with their mother without grave risk of psychological harm.

For reasons that are too numerous to explicate fully, the court finds that neither of the children suffered from PTSD in Sweden or suffers from it now. PTSD is a diagnosis that was originally developed to describe a disorder found in Viet Nam veterans and other adults exposed to severe trauma. All of the experts agree that the criteria for PTSD are generally diffi-

cult to apply to young children. Performance in school is one—but not the only—meaningful indicator of whether a child suffers from PTSD. The credible evidence indicates that A.D. has at all times been a happy, successful student in Sweden and the United States. The credible evidence indicates that C.D. too was happy and successful in day-care in Sweden.

To the extent that C.D. particularly now exhibits signs of stress, it is not necessarily attributable to sexual abuse. Rather, as Dr. Luxemburg noted, C.D.'s stress could be attributable to the separation of her parents, her lack of contact with her father, her move from Sweden, and uncertainty as to where and with whom she will live in the future, as well as to possible sexual abuse.

The court accepts that C.D. may have been subject to the sexual abuse described previously. However, as several of the experts opined, children, including sexually abused children, are often resilient. As Dr. Jenny testified, "many children who are sexually abused function very well in other aspects of their lives . . . ." Dec. 21, 2001 Tr., at 170. The court finds that, if she was sexually abused, C.D. is one of those children.

In October 2001, A.D. told Dr. Luxemburg that she wished to be close to her best friend in Sweden. More recently, both A.D. and C.D. have reportedly made statements indicating that they do not want to return to Sweden. A.D. has not, however, expressed any fear of her father. Rather, she has expressed concern about being separated from her mother and about being unable to speak Swedish adequately to perform well in school. A.D. will not be separated from her mother on

---

**6.** Morin's sister testified that in response to a question C.D. had said that she had a dream of "sticky stuff" that came from a horse's "hole," a term C.D. had used to refer to Danaipour's penis.

the conditions being ordered by this court for her return. Her concerns about school are ,a consequence of her wrongful removal from Sweden.

C.D. has expressed to Dr. Luxemburg concern about her father. She will, however, return to Sweden with her mother and will not have even supervised visits with Danaipour unless and until a Swedish court decides that they would be appropriate. In these circumstances, the court is not persuaded, even by a preponderance of the credible evidence, that C.D. will develop PTSD, or experience any similar trauma, if she is returned to Sweden with her mother.[7]

If returned to Sweden, A.D. and C.D. will experience a disruption of the therapeutic relationship they have been developing with Dr. Luxemburg. Dr. Luxemburg is, however, willing to assist in a transition to a new therapist in Sweden. This, among other things, will mitigate the psychological impact of returning A.D. and C.D. with their mother to Sweden to participate in a forensic evaluation to determine if sexual abuse has occurred and, if so, its implications for the custody of the children.

A proper forensic sexual abuse evaluation can be conducted in Sweden. A.D. and C.D. will feel sufficiently safe to participate when returned on the conditions being ordered. The court is not persuaded that C.D., particularly, will believe that her return is a punishment for disclosures she has made. The children successfully returned to Sweden after being wrongfully retained in the United States in 2000. Although it may be more difficult this time, the court finds that they can successfully return again.

A proper forensic evaluation will take about three to six months to complete once it is commenced. Danaipour will be able to participate fully in Sweden, which might not be possible if the evaluation were conducted in the United States, where it is expensive and professionally difficult for him to spend time. C.D. and A.D. will not, perhaps improperly, become more rooted in the United States during the evaluation. When the evaluation is complete, the Swedish courts, which have taken this dispute seriously in the past, will be capable of fairly deciding its implications for the future custody of A.D. and C.D. Among other things, they are positioned to make the necessary judgments concerning custody in the context of the resources available in Sweden to address issues that emerge from the evaluation. This court is persuaded that A.D. and C.D. will be safe while this process proceeds.

## IV. *ANALYSIS*

The foregoing facts do not provide clear and convincing proof that returning A.D. and C.D. to Sweden with their mother on the conditions being imposed will expose them to a grave risk of psychological harm

---

7. This conclusion is consistent with the opinion of Dr. Munson and contrary to those of Dr. van der Kolk and Dr. Jenny. None of the experts have met C.D. Dr. van der Kolk is eminent in his field. However, this is the first case in which he has ever opined that a child suffered from PTSD without personally examining the child. His opinions in meaningful measure rely on evidence not in the record. For example, he relied in part on a purported statement by Myra McLarey that C.D. said, "I like it when daddy does this." Dec. 20, 2001 Tr., at 216. This apparently refers to something C.D.'s grandmother told Dr. van der Kolk. However, no evidence of any such statement by C.D. was introduced at trial. The facts assumed by Dr. van der Kolk and the opinions rendered by him often went beyond the more nuanced views of Dr. Luxenberg on key points. In any event, many factors, including demeanor, contribute to the court's assessment of the credibility of the witnesses, including the expert witnesses.

or otherwise place them in an intolerable situation.[8] Therefore, McLarey has not satisfied her burden of proving that Danaipour's petition should be denied pursuant to Article 13(b) of the Hague Convention.

As indicated earlier, McLarey has essentially attempted to demonstrate that the instant case is analogous to *Blondin*. The court finds, however, that this case is distinguishable from *Blondin* in many material respects.

In *Blondin*, the respondent, Dubois, proved that:

> Throughout the course of their relationship, Blondin repeatedly abused Dubois, beating her with his hands and a belt, sometimes when she was holding [their older child] Marie–Eline. In addition, he often threatened to kill Dubois. Blondin also beat Marie–Eline frequently and threatened her life as well; in 1992, Blondin twisted a piece of electrical cord around Marie–Eline's neck and threatened to kill her.

78 F.Supp.2d at 285. Dubois and her children moved to a battered women's shelter for more than eight months. *Id.* After she and Blondin reconciled, he again often threatened to "kill everyone," leading Dubois to abduct the children and bring them to the United States. *Id.*

Dubois' expert interviewed the children and testified that, while in France, Marie–Eline suffered acute, severe traumatic stress disorder caused by Blondin's physical and verbal abuse of her and her mother. *Id.* at 290–91. In his opinion, a return of Marie–Eline to France under any conditions would almost certainly have triggered a recurrence of the traumatic stress disorder from which she suffered in

France. *Id.* Blondin offered no expert or other evidence to contradict Dubois' expert. *Blondin*, 238 F.3d at 157, 160.

The judge interviewed Marie–Eline, who was eight years-old. 78 F.Supp.2d at 293. He found that she had adjusted well during her several years in the United States and did not want to return to France. *Id.* at 293, 296.

Based on the expert's testimony and his own observations, the district judge found that there was clear and convincing evidence that the children would suffer from PTSD upon repatriation on any conditions and, therefore, denied Blondin's petition pursuant to Article 13(b) of the Convention. *Id.* at 285; *Blondin*, 238 F.3d at 162.

■ The Court of Appeals for the Second Circuit held that it was appropriate to consider the views of the child and the degree to which she was settled in the United States in deciding whether the Article 13(b) exception had been established. *Blondin*, 238 F.3d at 165–67. It also explained that, "[i]n cases of serious abuse, before a court may deny repatriation on the ground that a grave risk of harm exists under Article 13(b), it must examine the full range of options that might make possible the safe return of a child to the home country." *Id.* at 163 n. 11. This court understands that the Court of Appeals for the Second Circuit has correctly stated these aspects of the relevant law. *See Walsh*, 221 F.3d at 219.

■ The Court of Appeals for the Second Circuit emphasized the uncontested nature of the expert testimony, *Blondin*, 238 F.3d at 157, 160, and the fact that Blondin's evidence did "not purport to cast doubt on the [district] Court's finding that *even with all of* [the proposed] *arrange-*

---

**8.** The parties have implicitly agreed that A.D. and C.D. should not be separated and the court accepts this as true.

*ments* [for return] *in place,* the children face an almost certain recurrence of traumatic stress disorder on returning to France," *id.* at 161. Thus, it held that "in the particular and unusual circumstances presented," the district court should be affirmed. *Id.* at 168.

In the instant case, however, McLarey has not proven the persistent pattern of serious abuse established in *Blondin.* Although the evidence indicates that there is good reason to be concerned that Danaipour may have masturbated in front of C.D. and, on one occasion, engaged her in that conduct, such sexual abuse has not been proven. McLarey's expert testimony and other evidence was contested. It has not been proven that A.D. or C.D. suffered from PTSD in Sweden or suffer from it now. Nor has it been proven that either or both of them are likely to suffer from PTSD or any similar trauma if they return to Sweden with their mother on the conditions being imposed.

Neither A.D. nor C.D. testified and this court was not offered an opportunity to interview either of them. A.D. has reportedly expressed varying views on returning to Sweden. Most recently she has expressed concern about returning. The articulated reasons for her concern are primarily a fear of being separated from her mother and apprehension about speaking Swedish adequately to perform well in school. A.D. will not, however, be separated from her mother when she returns to Sweden. Her concerns about school are an unfortunate but inherent incident of her abduction and repatriation. *See Walsh,* 221 F.3d at 220 n. 14; *Blondin,* 238 F.3d at 164–65.

C.D. has recently told her therapist she does not want to return to Sweden or see her father. The court is not persuaded, however, that this view is based upon a history of sexual abuse rather than the stresses related to her parents' divorce and her abduction. The court recognizes that C.D.'s return to Sweden will disrupt her evolving therapeutic relationship with Dr. Luxemburg, but has found that a similar relationship can, with Dr. Luxemburg's assistance, be established with a therapist in Sweden.

■ In these circumstances, McLarey has not proven by clear and convincing evidence that A.D. or C.D. will be exposed to a grave risk of physical or psychological harm, or otherwise be placed in an intolerable situation, if returned on the conditions the court is ordering.[9]

McLarey's argument that the petition should be denied because sexual abuse by a custodial parent is a *per se* intolerable situation does not alter this conclusion. The State Department has written that: "An example of an 'intolerable situation' is one in which a custodial parent sexually abuses a child." *See* Department of State Public Notice 957, Hague International Child Abduction Convention Text and Legal Analysis, 1986. Although not conclusive, this interpretation of the Hague Convention "is entitled to great weight." *Blondin,* 238 F.3d at 162 n. 10.

However, in this case sexual abuse has not been proven. Rather, the evidence indicates that there is good reason for a forensic evaluation to be conducted to determine if sexual abuse occurred. Al-

---

**9.** In addition to *Blondin,* two other cases on which McLarey relies are distinguishable from the instant case. In *Ostevoll v. Ostevoll,* 2000 WL 1611123 at *15–*16 (S.D.Ohio Aug.16, 2000), there was a long history of proven abuse that supported the conclusion that repatriation on any conditions would trigger the recurrence of PTSD. In *Steffen F. v. Severina P.,* 966 F.Supp. 922, 928 (D.Ariz. 1997), repatriation would have required separating a sexually abused child from the mother to whom he was attached.

though returning a child who had been raped to the parent who molested her could reasonably be regarded *per se* as an intolerable situation, this is not such a case. On the facts established in this case, the court believes that "it must examine the full range of options that might make possible the safe return of a child to the home country." *Blondin*, 238 F.3d at 163 n. 11. It has done so.

McLarey has also not proven by clear and convincing evidence that Article 20 of the Convention operates to defeat Danaipour's petition. Article 20 provides that a court may refuse to repatriate a child on the ground that doing so would not be permitted by the fundamental principles of the United States "relating to the protection of human rights and fundamental freedoms." Hague Convention, Art. 20. McLarey did not address this claim in her Pretrial Memorandum and her counsel represented that she did not believe that Article 20 had ever been used to deny a Hague Convention petition.

As a leading commentator has explained, Article 20 has "nearly faded without a trace." Beaumont, P.R. & McEleavy, P.E., *The Hague Convention on International Child Abduction*, 1st ed. (Oxford Press 1999), at 172. This may have occurred because Article 13(b) and Article 20 appear to be redundant. If the return of a child would violate fundamental principles

relating to human rights, it would also involve returning him or her to an intolerable situation.

In any event, essentially for the reasons described in the foregoing analysis concerning Article 13(b), McLarey has failed to prove that the Article 20 exception is applicable in this case.

Finally, McLarey has not proven by a preponderance of the evidence that Danaipour's petition should be denied, pursuant to Article 13, because A.D. or C.D. "objects to being returned to Sweden and has attained an age and degree of maturity at which it is appropriate to take account of her views." Hague Convention, Art. 13, penultimate paragraph. As described earlier, the court has considered the evidence of the girls' views as part of its Article 13(b) analysis. The court has also considered whether such evidence alone provides a basis for denying the petition. It does not.

As indicated earlier, neither A.D. nor C.D. testified. The evidence presented does not prove that either of them objects to returning to Sweden on the conditions being ordered. Moreover, C.D., at age three, is not mature enough for the court to give any views she might express decisive weight. At age seven, A.D. might arguably be sufficiently mature, but this too has not been proven.[10]

---

**10.** The Hague Convention does not establish a minimum age for granting a child's objection dispositive weight pursuant to Article 13. *Blondin*, 238 F.3d at 166. Rather, this is an issue to be determined by the evidence in each case. In *Blondin*, the Court of Appeals for the Second Circuit noted that the district court did not determine that Marie–Eline, who was eight years-old, had attained an age and maturity at which it was appropriate to deny her father's petition solely based on her views. *Blondin*, 189 F.3d at 247.

No case has been cited by McLarey, or found by the court, in which the views of a

seven year-old child like A.D. have alone been deemed sufficient to deny a Hague Convention petition. The Hague Convention does not apply to a child who is sixteen years-old. Hague Convention, Art. 4. In providing an example of a case in which the penultimate paragraph of Article 13 might operate to prevent the return of a child, the Explanatory Report cited a child fifteen years of age. *See Blondin*, 238 F.3d at 166 (quoting Explanatory Report, ¶ 30).

In this case, while there was credible testimony that A.D. is mature for her age, she did not testify, she was not interviewed by the

In essence, this is a case in which there is a question of whether a particular form of sexual abuse has occurred. A forensic evaluation to determine if such abuse occurred can be performed in Sweden. A.D. and C.D. can, on certain conditions, be returned to Sweden without being exposed to a grave risk of physical or psychological harm, or any other intolerable situation. Therefore, the court is ordering the return of A.D. and C.D. to Sweden on such conditions [11] to permit a forensic evaluation to be performed and to permit the competent courts of Sweden to decide the implications of that evaluation for the future custody of A.D. and C.D. *See Walsh,* 221 F.3d at 219.

## V. *ORDER*

In view of the foregoing, it is hereby ORDERED that:

1. Petitioner Iraj Danaipour's petition for the return of A.D. and C.D., pursuant to the Hague Convention, is ALLOWED on the following conditions.

a. Respondent Kristina McLarey shall, by January 16, 2002, return A.D. and C.D. to Sweden at her expense.

b. Unless and until otherwise ordered by the courts of Sweden, A.D. and C.D. shall reside with McLarey in Sweden.

c. A forensic evaluation, pursuant to established protocols, shall be conducted in Sweden as expeditiously as possible in order to determine whether A.D. and/or C.D. has been sexually abused and, if so, by whom. Danaipour and McLarey shall fully participate in this evaluation and in any other evaluation that may be ordered by the courts of Sweden.

d. The courts of Sweden shall decide the implications of the foregoing forensic evaluation for the future custody of A.D. and C.D.

e. Unless and until otherwise ordered by the courts of Sweden, Danaipour shall have no contact, directly or by telephone, with C.D.

f. Unless and until otherwise ordered in the future by the courts of Sweden, Danaipour may continue to speak by telephone with A.D. three times a week, for up to fifteen minutes. Either Danaipour or McLarey may record the telephone calls, but A.D. shall not be informed of any such recording. No one other than A.D. shall be in the room when she is speaking with Danaipour.

g. McLarey shall surrender her passport, and the passports of A.D. and C.D., to the courts of Sweden.

h. McLarey shall not remove A.D. or C.D. from Sweden without the authorization of the courts of Sweden.

i. Danaipour shall not initiate or pursue any contempt, defamation, or criminal proceedings against McLarey based on events occurring before the date of this Order.

j. Unless and until otherwise authorized by the courts of Sweden, Danaipour shall not attempt to enforce any custody rights relating to A.D. or C.D. established by Orders issued before the date of this Order which are inconsistent with the terms of this Order.

---

court, and no expert opined that she had attained sufficient age and maturity to justify not ordering her to be returned to Sweden based solely on any objection she might have. Therefore, McLarey has proven neither that A.D. objects to being returned to Sweden on the conditions being ordered nor that she is of sufficient age and maturity to deny Danaipour's petition based solely on any such objection.

**11.** In contrast to *Walsh,* 221 F.3d at 221, the court finds that Danaipour will obey court orders in the future, as he has in the past.

k. Danaipour shall forthwith request that an appropriate court of Sweden enter the terms of this Order as a "mirror order" enforceable in Sweden.

1. Pursuant to Articles 4, 7, 19 and 34 of the Hague Convention, and pursuant to the doctrine of non-exclusivity of the Convention, this court shall retain jurisdiction over the parties until C.D. reaches the age of sixteen.

2. Any wilful violation of this Order may be deemed a criminal and/or civil contempt.

3. This Order shall be transmitted by the Clerk of the Court to the United States Department of State for transmittal to the Central Authority of Sweden.

4. This Order may be presented to any law enforcement agency of any Hague Convention signatory country by a party to secure any appropriate relief.

5. This Order is being executed by the court in English and will, upon presentation by Danaipour of a certified translation, also be executed in Swedish. In the event of any dispute concerning the meaning of any word or provision, the English language version shall be authoritative and shall prevail.